The United States Court of Appeals for the Federal Circuit is now open for discussion. God save the United States in this honorable court. Good morning. First case this morning is 08-5050-5056, 1st Home Liquidating Trust v. Bryan. Mr. Dinser. Excuse me, that's against the United States. Thank you, your honor. May it please the court. The trial court erred when it concluded that 1st Home's investors entered into a goodwill contract with the government. Help me here. Would you understand the difference between RAP accounting and GAP accounting? I think I understand what GAP accounting is, but what is RAP accounting or what was it at this time? It was the Federal Home Loan Bank Board had created certain exceptions to GAP accounting that allowed certain things to be counted. In this case, the relevant thing here was if you sold certain loans, you could book the differential, the loan losses, as regulatory capital, which is what the thrift hit had done prior to the conversion. So where was RAP reflected in regulations of the bank board? Yeah, I believe that that's the case, either regulations or pronouncements by the bank board. Okay, and did RAP allow pushdown accounting? That was GAP, your honor. So RAP was, it was deviations from GAP. I look at Levin and it mentions that RAP allowed pushdown accounting in the 35-year amortization period. Is that wrong? That was, if you, at the time that this transaction took place, and the regulations did change over time, to get, as I understand it, your honor, to get pushdown accounting and to book the goodwill for longer than 30 years, you needed special permission from the bank board. Did RAP allow for pushdown accounting? Yes, but so did GAP. Yeah, yeah, but did RAP allow for a longer period of amortization of the goodwill than GAP did? I don't believe so, your honor. It was the same? I don't think it spoke to that. I think you had to get, and I'm not sure, your honor, to be honest, but I think you had to get permission, special permission, which is why that you had entities seeking forbearances to go beyond what GAP allowed you to do at the time. And so what this thrift had was, under RAP, it was solvent, but under GAP and, you know, on a market-to-market basis, it was insolvent. After the conversion, it planned to book and it did book some goodwill pursuant to GAP, not pursuant to RAP. So the conversion from RAP to GAP wouldn't affect the pushdown accounting or the amortization period, is what you're saying? What it did was, what was previously counting as regulatory capital was no longer going to be allowed to be counted as regulatory capital. Well, that's the loan loss aspect. Yes. Yeah, but I'm asking about the goodwill aspect of it. You say RAP allowed pushdown accounting. Was there a supplementary to GAP? But what you're saying is that there wasn't anything in the conversion from RAP to GAP that changed the pushdown accounting. Well, once you're in GAP, you have to follow – they were purely in GAP post-conversion as the – But what you're telling me is that GAP applied to pushdown accounting before the conversion. I'm sorry, Your Honor, I don't understand the question. They used RAP before the conversion, right? Yes. But RAP wasn't either more favorable or less favorable with respect to pushdown accounting than GAP, right? That's my understanding, Your Honor. So when they sought a forbearance, they didn't have to seek – none of their documents sought anything. When they described goodwill in a few documents, they described it pursuant to GAP because they didn't need any special allowance. GAP allowed them to do the length of time that they were seeking. But those after the conversion? Yes, Your Honor. And that conversion then allowed them to only use GAP and not RAP, the accounting process? Except to the extent that they got a forbearance. And they got one forbearance, and that's a net worth forbearance, which the parties agree has nothing to do with GAP or – it has nothing to do with goodwill or the alleged breach. Was there a contract with respect to that forbearance, the loan loss forbearance? We don't believe so, Your Honor. If there was, the forbearance only lasted for three years, so it expired before FIREA. It was a three-year forbearance. So we don't believe a contract was formed. Your contention is that even if there was a contract, it didn't incorporate a goodwill term? It didn't incorporate goodwill terms. It expired before FIREA. And keep in mind, the people suing here are the shareholders. The forbearance letter was only sent to the thrift. And so even if you can whip up a contract with the forbearance letter, what First Commerce tells us is you have to look at who received it. The shareholders did not receive it. They were not a party to any of this alleged contract, and so they can't be suing here for restitution. What we have is the trial court found a series of steps, starting with negotiation, and found that there to be a contract. Were there negotiations over the three-year forbearance? There was what the thrift themselves described as consultations. They talked to the regulators about it. That doesn't answer my question. Is your position that there wasn't even a negotiation with respect to the loan loss conversion and the three-year forbearance? Absolutely, Your Honor. The documents that they identify as being the four documents, they can be found at A1089-113, are all letters from the thrift attorneys to the government. There's no governmental letters, and there's no letters from the shareholders. And what those documents, they don't mention the word goodwill. They don't mention the word amortization, and they don't mention the word negotiation. But that's not responsive to my question. My question was, I understand your position that there was no negotiation with respect to goodwill. But was there a negotiation with respect to the loan loss conversion and the three-year forbearance? I mean, they wanted five. There was three. There seems to have been a back-and-forth about that. Actually, there wasn't a back-and-forth, Your Honor. What happened is they discussed it with the regulators. They put in an application that said five, and the regulators ultimately gave them three. So if there was a negotiation, it didn't go anywhere because they didn't settle on a number that they ultimately got. What they had was a discussion. They learned about it. They consulted about it. And we don't believe that that can be characterized as negotiation that went to some point, which then was the jumping-off point for some alleged contract. The government was the primary – I mean, the Federal Home Owned Bank Board was the primary regulator. And so these types of discussions took place all the time, and they weren't contractual. So there's nothing to describe the negotiations that they allege. And under Seuss, if there's no documentary description of that, then the court should assume that there were no negotiations. Moving on to the alleged offer, the plaintiffs and the trial court found two documents that allegedly carry the offer, the application and the business plan. The application is simply an application to convert. It's purely regulatory. It does not contain the words goodwill or amortization. And it requests a forbearance, a net worth forbearance. There is a distinct absence of a request for a goodwill forbearance. This is the dog that doesn't bark. This is the demonstration they knew had to seek a forbearance, and they chose not to. Similarly, the application listed certain investors. There's no question that it did. The problem that the plaintiffs have is those are not the people who ultimately acquired the shares in the thrift and are suing. The list of investors changed repeatedly over time. In fact, even after the government, the Federal Home Owned Bank issued a resolution allowing the conversion, different shareholders' lists changed then as well. So even if there was an agreement, it was an agreement with the thrift and not with the shareholders. Even if there was an offer, it wasn't by the shareholders. They don't have standing to sue. They don't have privity, and they can't receive the restitution that they want. What if, in fact, the shareholders were the beneficiaries of that contract? You mean third-party beneficiaries? Under Glass, Your Honor, this Court has said very clearly in subsequent cases that there has to be an intent to benefit specific individuals expressly. Well, the original investors were specifically intended to be beneficiaries, weren't they? I don't think so, Your Honor.  We would say that this Court has found in cases such as Kane and especially Carnes that simply the identification of potential shareholders is not enough to make them parties to the contract or third-party recipients. There has to be an express desire to benefit them, to move them from their standard shareholder standing to something special. And there wasn't that to any shareholders, but there certainly wasn't that to this group of people who are now suing because they weren't even involved in the process, many of them at least, until much later in the game. And if I may, what happened was because of tax benefits, after the Federal Home Loan Bank Board approved the conversion, plaintiffs said, hang on, we'd like a delay. And they said because they needed to go out and find new investors. And this is what they wrote after they found new investors. There are many new investors who had not expressed an interest in first-home stock as of the date of the Federal Home Loan Bank Board approval. So these people weren't even interested when the government allegedly made this counteroffer that the trial court found in the approval. So aside from whether a contract exists, the court should find that these individuals are not privy with the government and did not have standing to pursue this claim. Moving on to the alleged acceptance, the forbearance letter, as we've said, was issued, and it only described the net worth forbearance. And so under the case law in Anderson, that is dispositive. The government issued a forbearance letter. If that was contractual, it demonstrated the government's lack of intent to contract with the plaintiffs. And I'm just going to mention briefly— Not on the subject of goodwill. It doesn't indicate a lack of intent to contract with the plaintiffs with respect to the three-year forbearance. Granted, Your Honor. But what this court did in Anderson was—there's two points to that, Your Honor. One is that in Anderson, this court said, we're not going to look, because it was the same situation there. There was a forbearance. And in Seuss, the same thing. The court said, we're not going to look to figure out if there was this other contract, because even if there was, it missed the vital term. So this court in Anderson said, the resulting agreement, if any, did not contain the crucial government promise. And so it didn't bother going to that next step of finding out if there was this other contract. In fact, the fact that if that forbearance letter was contractual and it left out that term, there's no reason to go and consider whether there was a— Do you want to save your rebuttal time? I do. Thank you, Your Honor. Thank you, Your Honor. Good morning. May it please the Court, I'm Jerry Stock from Greenbrook-Trarigan. I represent the Appellees and Cross Appellants. And I'm here to explain why the Court of Federal Courts' decision should be affirmed. Can you rebut the argument with respect to WRAP that there wasn't any difference between WRAP and GAAP on the pushdown accounting and the amortization period? I wanted to address that first, Your Honor, because I think it's very important. My understanding is that WRAP, the WRAP principles, did not address pushdown accounting at all. That was a GAAP concept, as was purchase accounting and goodwill. WRAP, as I understand it, was kind of an overlay that allowed such things as appraised equity capital to be included in capital. So before the conversion here, when the bank was operating under WRAP, GAAP applied to the extent that the WRAP overlay didn't change it. Is that correct? That is correct. However, in this transaction, the regulators, it's very clear from the documents that are in the appendix, from the exchange of letters before the application, the regulators insisted that First Home eliminate its WRAP capital, convert from WRAP to GAAP. Yeah, but that had to do with the loan loss. That is correct. Your problem is this. You've got a pretty good argument that there might have been an agreement with respect to the loan loss and the three-year forbearance, because there was a forbearance letter. Maybe there were some negotiations over the three-year period. But the problem is I don't see any negotiations over goodwill accounting. There certainly isn't any forbearance with respect to goodwill accounting. So how can it be that there was a contract about the goodwill accounting? There are references in the trial court's opinion to negotiations. But what negotiations took place, it seems to me, didn't concern the goodwill but concerned the loan loss reserves. Let me try to explain if I may, because it's a very important point. I agree. As I understand what happened here, the WRAP accounting, the WRAP capital items were, as I said, kind of an overlay, something that the bank board allowed in addition to GAAP. In this transaction from the inception, the bank board insisted that subsequent to the conversion, if there was to be a conversion, First Home would have to eliminate those WRAP items and follow GAAP exclusively. But that has nothing to do with goodwill. Well, I want to explain why it does, if I just may have a moment. The elimination of the WRAP capital led to a $67 million deduction from capital. It changed the Thrift's regulatory capital position from positive roughly $30 million, I don't remember the exact number, to negative $30 million. And that was going to happen under the condition imposed by the bank board if this conversion took place. At that point, the Thrift had a choice. It could stay where it was with the WRAP items in capital compliance and forego the conversion, forget it. But if it proceeded with the conversion, which both sides wanted, because the conversion was going to bring in $30 million in tangible capital, it had to eliminate the WRAP items, take a $67 million hit to its capital, and do what with that capital hold? Use purchase method accounting. I don't think you're really responding to my earlier question. Where's the evidence that there was some negotiation about the use of GAAP goodwill accounting, which was the standard? And if I understand correctly, that standard or GAAP treatment of goodwill existed before the conversion, existed after the conversion. There wasn't anything new that the bank was being given as a result of the regulatory action on goodwill. Well, the conversion would not have happened under the bank board's strictures unless the WRAP items were eliminated. Yeah, yeah, but the WRAP items weren't goodwill items. They were related to loan losses. So my question is, where's the evidence that there was negotiation about the treatment of goodwill? We have a situation. Goodwill could be subject to pushdown accounting before the conversion, after the conversion. Nothing changed. What's the evidence that anything changed? You know, I may not be understanding your question, and I apologize, but as I see it, there was a question about whether the conversion was going to happen or not. It was a choice. The thrift had a choice to proceed. Sure, but what about in terms, your contention is that they got promised something about the treatment of goodwill as a result of negotiations between the bank and the bank board. I'm saying you first have to show me that there was some change in the treatment of goodwill before and after the conversion. If I understand correctly, both sides agree that under WRAP there wasn't any provision for goodwill, that you had to apply GAAP before the conversion and after the conversion. So where's the negotiation? The goodwill would not, let me just, I'd like to move on to something else, but I'd like to satisfy you also. The goodwill would only arise if the transaction happened. There's no goodwill prior to the transaction. There's no possibility of a conversion with the WRAP items. I understand. Okay, and so my position is that when you put all that together, if the conversion was going to happen, if First Home elected to proceed, it would have to deduct the WRAP items. It would then be allowed to use purchase accounting because the transaction happened and the resulting goodwill would offset the $30 million hole that was left by the deduction of the WRAP items. That's the best I can do on that issue. But the contract that we're seeking to enforce arises from the application of the first commerce principles, the offer, counteroffer, and acceptance by performance. Why don't you move on? You said you had other points you wanted to make. Right, that's what I want to make. I'm moving on to first commerce. The offer here was in the application in the business plan. Contrary to what Mr. Dintzer just said, and it's in their yellow brief as well, the application did mention both goodwill and long-term accounting for it. 30-year amortization of goodwill was specifically mentioned in the business plan that was a part of the application, and as was the request for the five-year forbearance on the WRAP items. But that was only going to the net worth, though, wasn't it, on the forbearance? The forbearance request did not request the forbearance for goodwill. That is correct, and I think that's the crux of the case. So if you request the forbearance on the goodwill part, then you might have an underlying basis for a contract. Where in the conversion documents is there the basis for a contract on goodwill? It's in the application. The request or the proposal to use purchase accounting and amortize it over long-term, that was in the application. That's a contractual offer. The government, let me just take a step back, because the first point is there's a contractual, our position is there's a contractual bargain here because of the net worth forbearance. The request for five years was granted for three years. That was a departure from the regulations that was proposed by the thrift, and that was counter-offered, but basically accepted by, you know, the departure from the regulations as to the net worth forbearance was accepted by the government with the change from five to three years. That makes the deal contractual. But the entire deal dealing with the net worth at that point is correct. Where is the deal for the goodwill except on the gap? You still have to deal with gap for your goodwill. Right. It was proposed in the offer. It was not disturbed in the counter-offer, and our position is that under the principles that were laid down in first commerce, offer, acceptance, or offer, counter-offer, and then acceptance by performance, the proposed amortization of goodwill that was set forth in the application, and our view is that our position is that the application is a contractual offer that had basically two components as to net worth. The mere fact that there was a back and forth doesn't mean that it's an offer or counter-offer. The question is, was there an intent to contract as opposed to a discussion over standard regulatory requirements? Just because there's some sort of suggestion that you use this and then a suggestion that it be different, doesn't mean that that's an offer and counter-offer in contract terms. What's the basis for believing that there's an offer and counter-offer that was a contract-based situation? The basis for believing that is that the application, the offer, proposed the five-year forbearance, which was a departure from the regulations. Our position is that made the offer contractual. The acceptance of that, of that term, made the deal contractual, and the goodwill treatment, which carried through the counter-offer and then was accepted by the thrift's performance in accordance with its offer. The thrift did amortize the goodwill long-term, 25 years when it completed this conversion. At the time the conversion closed, that was not GAAP. So your suggestion is because, in your view, there was a contract about the forbearance and the loan loss reserves, that made everything in the regulatory approval contractual? Well, we wouldn't acknowledge it's the regulatory approval. That made the transaction contractual. Everything in the transaction became contractual because one term was negotiated. Well, at least the goodwill, as a matter of interpretation, as we've explained in our brief, if the formation issue is answered by first commerce, counter-offer acceptance by performance, it's a contractual deal because of the, as I've just explained. We haven't rejected that in MOLA and Anderson, where we said that there may have been a negotiation about one term, but that doesn't make the whole transaction contractual? Well, in Anderson, I don't think the court actually reached the issue because, in that case, it was clear. What about MOLA? MOLA, I'm sorry I can't speak to, but in Anderson, I just don't recall MOLA. I'm sorry, Your Honor. But in Anderson, it was undisputed that the request for long-term amortization of goodwill was withdrawn before the bank board acceptance. But again, just to be clear, that is the way we see it, and that's what the Court of Federal Claims decided, is that the transaction became contractual by virtue of the network forbearance back and forth. Goodwill was part of the offer. The offer was contractual. It wasn't disturbed in the counteroffer. It was accepted by performance by First Home when they complied with the long-term amortization that they originally had proposed in their offer, which at the time of the closing was no longer in accordance with GAAP, and which we contend, as we briefed, shows that the thrift at least understood that it was that long-term amortization that was critical and not merely compliance with GAAP. As for the investor status, this case proceeded primarily really until judgment, until the lower court's decision. First Home was the plaintiff. And we're making the same arguments we're making here, that the Court of Federal Claims, of course, accepted. In awarding money back restitution, the court recognized that that award or concluded that that award would be appropriate only to the original investors and directed us at that time. The original investors weren't listed in the application in the sense that they changed after the application was filed, right? They did change. That is correct, Your Honor. They changed to some extent. But at each step of the change, the names, the identities were submitted to the bank board, and I think the documents clearly reflect just the keen interest by the bank board, not only in identities, but subscription agreements were submitted with the application. The bank board wanted to know that this thrift had investors lined up that were really going to put this money in before the bank board proceeded with the transaction. What about the causation issue, where you seem to agree that there are three tests under FIREA that this bank would have flunked two of them regardless of the treatment of goodwill, right? That is correct. That's correct, Your Honor, but that the breach substantially impaired, assuming a contract right to continue to include the goodwill, under the substantially impaired, the value test, I don't think there can be a question. The thrift stayed in business for three years. It was profitable prior to FIREA. We've shown that by financial statements that are in the appendix, and it continued to operate for three years after FIREA and then liquidated itself, not an RTC liquidation, a voluntary liquidation, which I think is unique in the whole history of this, and came up with a surplus, and came up with a surplus. And so this is not a case like Admiral, where the bank was in dire straits, failed capital requirements even before FIREA. Thrift was in full compliance prior to FIREA, assuming the goodwill is included, and had tangible capital compliance, which is kind of the primary requirement, I think, even after FIREA. Mr. Stark, what was the consideration that was given by the investors in conjunction with the contract for the goodwill, for the change in the goodwill accounting? Is there any specific consideration that was provided from their investment? I think that was the consideration they provided, Your Honor. For their contract, or the contract between First Home and the U.S. government? Well, you know, it's a three-party transaction. The deal was, I mean, the facts are that it was primarily negotiated by First Home, between First Home and the Bank Board. I mean, that's the way the deal happened. All of these provisions that I've been talking about were essential in bilateral negotiations. But as the Court of Federal Claims found, and as we've briefed, I think, under the precedence, LeVan in particular, it's correct to conclude, if you find a contract, and you find a breach, and you award money back restitution, it's correct to conclude that that money back restitution should go to these investors. They are integral enough to the transaction to entitle them to a repayment. All right, thank you, Mr. Stark. Thank you, Your Honor. Thank you all. Mr. Disser. Thank you, Your Honor. Starting, let's see, with First Commerce that counsel cited. First Commerce had a forbearance, a goodwill forbearance. It was sent both to the thrift and, at least the court found, to the holding company. So First Commerce doesn't really speak to this type of a case. Second, he mentioned the business plan. The business plan was required by regulation. It was required to spell out the planned use of what they would do, including what would include the accounting. The business plan did not describe anything that was allowed by GAAP, which is why it was consistent with GAAP and did not seek any extra requirements. There was no forbearance necessary. So the business plan is not an offer any more than the application was an offer, Your Honor. I want to turn the court's attention to the private placement memorandum upon which the stock was bought. I think this is very important. As the court knows, it had to list all material items. There's several parts about the PPM. One is it says that one risk factor will be a possible change in regulations. That's at A101147. No mention of a goodwill contract or protection against the change in regulations. In fact, it mentions the net worth forbearance, but there's no mention of a forbearance or agreement regarding goodwill or addressing goodwill. In fact, the PPM shows an accelerated write-off of goodwill, that it was going to be gone within three or four years because they expected it to be used when the NOLs were used. And that can be found at A101155. They didn't expect to keep the goodwill very long, and that's what they told the shareholders when the shareholders purchased the stock that they're now being awarded restitution on. Do you think that representation in the PPM regarding the potential change in regulations is sufficient to cover the issue? I think it is, but I think that combined with the fact that there was no mention of a goodwill contract or agreement, not only would that have been required, but they would have wanted to say that. That would have been a selling point. That's because lawyers draft it up, and they just try to cover their backside, too. Anytime you get one of those PPMs, everything that's in there is but the kitchen sink. And so the absence of the kitchen sink makes one wonder. In this case, they're saying this was a vital, important element. Then you would expect to find it in the PPM. And certainly the shareholders can't say, we relied on this when we invested in the deal because it's not in the PPM. So the PPM is a vital element to this in finding that no contract existed and certainly none with the shareholders. The plaintiffs mentioned subscription agreements that attach to the application. The subscription agreements can be found at A100, 160 through 185. All they say is an expression of interest. They expressly say that they're not binding. So they're simply expressing an interest there. These people are not offering anything in those documents. The plaintiffs suggest that everything is contractual. I think the court addressed this with the plaintiffs. Everything in the documents can't be contractual. It would be the deviations from the things that would automatically be done as part of the regulatory conversion. Those are the only things that could conceivably be contractual. In this case, the net worth forbearance. In their business plan, among other things, the plaintiffs say they're going to acquire two new thrifts. Do they have a contractual obligation to acquire those thrifts? Of course not. Can the government sue them if they don't acquire thrifts? Of course not. The business plan merely describes what they're expecting to do. In fact, the business plan says that it may have to be revised if regulations change. Finally, I wanted to talk about First Home to Thrift. It can't recover on its own. It's admitted that there's no lost profits. It was insolvent and losing money at the time of the transaction. It didn't lose anything. Because of that, there's no recovery there for the thrift at all. If the shareholders were not parties, were not privy to an agreement, and I think Mr. Stock said things of that nature, then there's no recovery in this case. Unless the court has any questions, we ask for the court to reverse the restitution. Thank you. Thank you. A minute or so. Yes, sir. On the cross appeal, yes, sir. I would like to say that the other points are addressed in our brief, the PPM and so forth. On the cross appeal, though, if the court finds a contract, as we think the court should, and a breach, but that the investors are not, contract parties are not otherwise entitled to restitution, then our cross appeal argues, again, I'll refer you to the briefs for elaboration, that First Home is entitled to restitution. It still depends on the finding of a contract. That is correct, Your Honor. I'm assuming the finding of a contract, but that the investors are not contract parties. The award of restitution should be made to First Home. Clearly provided a benefit to the government by arranging this transaction, and unlike the cases where restitution has been rejected by this court, Glendale and so forth, the measurement of the restitution that we propose here is the amount of the invested funds. It's clear, it's objective, it's tangible. It's not this elusive liabilities assumed that was rejected in Glendale. So that's the basis for the cross appeal. Thank you. Thank you very much. The case is submitted.